Thank you. We'll hear argument next in No. 22-343. Hernandez v. Office of the Commissioner Let's just wait a second for people to get settled. Okay, Mr. Gregg. Thank you, Your Honor, and may it please the Court, my name is Nick Gregg. I'm the attorney for Plaintiff Appellant Angel Hernandez. As this Court knows, this is an appeal from the District Court's grant of summary judgment to, I'll refer to them as Major League Baseball. The defendants are technically the Office of the Commissioner of Baseball and Major League Baseball Blue, Inc. But it's easier just to call them MLB. The primary issue in this appeal is this. Can an employee ever succeed on a disparate impact discrimination claim where the sample sizes and employee pools are structured in such a way that it is virtually, if not actually, impossible to prove any statistical significance by the traditional statistical tests such as the Fisher's exact test or the Chi-squared test? Can I ask about this disparate impact idea? So, like, you also brought a disparate treatment claim, right? We did. And the District Court thought that there were legitimate nondiscriminatory reasons for the nonpromotion and that you hadn't shown that they were pretextual, right? Correct. Now you also bring a disparate impact claim, and your claim is not that the criteria that Major League Baseball are applying inherently have a disparate impact. You're not saying that Hispanics are less capable of showing leadership skills and the other factors. Your argument is that actually it's so loosely applied that it allows people to distribute it intentionally, right? Actually, if I could— Your claim is that Mr. Torrey is just sort of using it as an excuse to, like, allow his bias to run rampant, right? If I could modify that just slightly and be a little more specific. The policy or practice that underlies the disparate impact discrimination claim is investing sole authority to promote these umpires to crew chief in a non-minority individual and then not setting forth any objective criteria. Right. So that's fine. That's not what I'm puzzled about. So you have the claim that this one individual discriminated against your client. The district court says, no, there are legitimate non-discriminatory reasons for what he did, and we don't think that he was acting in a discriminatory fashion. Then you say, well, actually letting this guy make a decision is a disparate impact, right? I mean, aren't you just repackaging your disparate treatment claim as a disparate impact claim? I don't think so, Your Honor, and there's case law that says— So, like, if the decision maker were not Joe Torre but were some other official, would you have a disparate impact claim? As long as that individual was a non-minority and he was the only one making—he or she was the only one making the— So if you had a minority making the decision, it would be okay if it were a single person? Can you say that again? I'm sorry. If there were a person who was a minority making the decision, it would be all right to vest the authority in that single individual in your view? I don't know that in my view that would be sufficient, but the case law— Listen, that's the position that you're taking right now? I will acknowledge that the case law states that when the sole authority is vested in a non-minority, that that can be the basis of a disparate impact claim. I'm sorry. You're asking us to hold that allowing white people to make employment decisions is an illegal and unlawful employment practice? No, no, of course not. There's two parts to the policy or practice that is underlying the disparate impact discrimination. It's vesting sole authority in a non-minority individual, and then it's not using any objective criteria. It's letting this non-minority exercise his subjective discretion alone. Well, he used his objective criteria, right? I mean, he testified that there's this factor of overall quality of performance, which means strike zone accuracy, missed calls, ability to properly enforce the reply regulations and procedures on the field as a reply official and all of that, right? Those are objective criteria. You just don't trust that he's faithfully applying them. Well, what I think we're getting into is a discrepancy between what he actually testified orally at his deposition and then what's contained in his declarations that were filed as exhibits during the summary judgment briefing. In his deposition, he says leadership ability, focus, ability to bounce back. Hustle. Hustle. Hustle is one of the factors. Hustle. Hustle, right. Yes. I always wanted a job where you got paid for hustle. Yeah, I would like to think I'd be okay at it, but you probably would too. But again, your claim under the heading of disparate impact is against Major League Baseball, and it shouldn't be that this one particular person is discriminating. It has to be that there's a policy or practice of the defendant that you're challenging, right? But that policy and practice is giving 100 percent authority to make crew chief promotion decisions to Joe Torrey and no one else. That is one of the two outcomes. And it's because why? Because you think Joe Torrey himself is biased or any non-minority person would be biased or it's always inherently a biased decision? So the Supreme Court in Watson, which is kind of the seminal decision for allowing subjective employment practices to be the basis for disparate impact discrimination claims, they and other courts following it have acknowledged that when an employer uses these subjective criteria, particularly when it is a single non-minority individual using those subjective criteria, that creates, I'm using my own phrase, but the idea from the case law is a breeding ground for discrimination, even if it's not intentional. And so that's what we're alleging here is not that Joe Torrey employed his subjective opinions to intentionally discriminate against individuals, although we allege that he did intentionally discriminate against Angel Hernandez, but that allowing him to do that, even though it is facially neutral, creates an environment where the... You do not have – that he did not intentionally discriminate, so that there were legitimate non-discriminatory reasons for the decision. So if it turns out that we also recognize this practice as could be the basis of a disparate impact claim, if we don't overturn the finding that there were legitimate non-discriminatory reasons here, doesn't it mean that your client was not harmed by the practice? Because he was not denied the promotion because of this practice. He was denied the promotion because of the specific reasons the district court found were legitimate and non-discriminatory. So I think – well, first of all, there's case law that says that disparate treatment and disparate impact claims can coexist in the same litigation, right? Yeah, but usually what it is is there's something else, right? So somebody – the question is whether somebody was intentionally discriminated against, and they say, well, you know, he didn't pass the qualifying exam or something, and then you can have a claim, well, the qualifying exam has a disparate impact on different groups, right? They're using a mechanism that has a disparate impact. But here it all depends on whether this decision-maker was acting in a biased fashion, both of them, right? Albeit in the disparate impact situation, he wouldn't be consciously acting in a biased manner. But the disparate treatment claim has more elements to it. So your argument is, okay, under the disparate treatment claim, we think he intentionally discriminated against him because he's Hispanic. The district court says no, there were legitimate non-discriminatory reasons for his decision. And you're saying, well, okay, maybe he didn't intentionally do it,  I think that's probably a fair characterization, and one of the things— But doesn't that go into this question about whether it's pretext? I mean we have a whole analysis about whether the decision – the legitimate non-discriminatory reasons were pretextual. If in fact they were thin enough that we could determine that Mr. Tory was subconsciously discriminating, wouldn't that establish that these are pretextual reasons? It gets back to the fundamental distinction between disparate treatment and disparate impact claims. For disparate treatment claims— No, I know, but you just said the difference would be, okay, in disparate treatment we're saying Joe Tory is intentionally discriminating, and in disparate impact we're saying he's subconsciously discriminating. But if he's subconsciously discriminating, isn't that – doesn't that go to whether the legitimate non-discriminatory reasons were so thin that we could make that inference? Isn't that the kind of analysis we do in determining whether the reasons are pretextual? I think that a lot of the evidence that could be used to support the disparate impact claim would also go to pretext. But I think as a legal matter— You want to separate them out? I think they are separate. On your disparate impact claim, the district court thought that you didn't provide an alternative that would undo the impact, right? Okay, so what do you think Major League Baseball is required to do that would eliminate the disparate impact? So remember, the policy of practice for the disparate impact claim is vesting sole authority to make these promotion decisions in a non-minority and then letting him use almost 100 percent subjective criteria based on what he actually said in his deposition, not the contradictory declarations, in making those decisions. So we thought that the alternative practices were actually very straightforward. Take the decision out of his hands. You have a whole umpire department that's full of umpire supervisors, observers. You have various umpire executives. Make it a collective decision, maybe not a whole department, but let's take it out of this one man's hands and put it into the hands of a group— So you want the court to oversee the hiring practices within Major League Baseball and make sure that there are multiple decision makers and a review process or something for making these promotion decisions to crew chief? No, I'm not asking the court to actively oversee anything, but if the policy, the problem with the policy is putting the sole authority into the hands of a non-minority and letting him make subjective decisions pursuant to that authority, take it out of his hands and put some objective criteria in play. And back to what you raised— I mean, you've said that in the hiring context, subjective decision making is not impermissible, right? It is not impermissible, but as the— People make subjective hiring decisions all the time. Could you repeat that? People make hiring decisions based on subjective factors, like that is a normal part of the hiring process, right? It is, but as the Supreme Court acknowledged in Watson, there's when you set it up in the way that it's set up here, single non-minority, subjective criteria, it creates a situation where discrimination, even if unintentional, can run rampant because of the biases underlying individual's mindset. Why wouldn't that be so in virtually every employer in the United States, that there is some non-minority in many cases making a subjective determination about whether this person will fit in well with the culture of the organization? It's not a group decision, and they make whatever hiring decisions they make. I mean, I don't really understand what the limits of your position are. So I don't think that the—if Joe Torrey were replaced with a minority, I'm not saying that that would 100% correct the problem or would completely invalidate Mr. Hernandez's disparate impact discrimination claims. I guess it would because you just articulated the practice that you're challenging as having a non-minority who's making subjective decisions. So if it were a minority, you'd say that that would not be the impermissible practice. But there still is a second— So if you are saying if Joe Torrey were a minority, then you would not have a disparate impact claim. I would acknowledge that if he were a minority or he were replaced with somebody that was a minority, that we couldn't rely on the case law that we do that says that both of those two things together creates an impermissible policy. But there's still case law that exists that says that subjective criteria in certain situations can form the basis of a disparate impact discrimination claim. I would acknowledge that if— And why is that—is this one of those situations? So how do we know that the subjective decision-making here, unlike all the other places where subjective decision-making is used, is unlawful? And so this gets into what I think is probably the crux of at least the issues raised by Mr. Hernandez on appeal, which is the inexorable zero, right? And so that's discussed at length in the briefs. It's undisputed that in Major League Baseball's entire history, which has been over 150 years, there has been one minority umpire promoted to preaching. One. Since the year 2000, there have been zero. And so why is that is the question. Well, so we're talking about the period from 2011 to 2017, right? From Joe Torrey coming in until, you know, you filed a lawsuit, right? That's the period where—that the employment decisions are being challenged, but the historical presence of the inexorable zero has probative value in disparate impact discrimination claims regardless of— But you're— Counsel, are you arguing in your brief that the inexorable zero theory is enough to survive summary judgment? That's your argument? It's not entirely our argument, Your Honor. There's case law that says, and I believe Waysome was a case, and I have some others here that I can specifically cite, but there's case law that says that when sample sizes are small, the statistical analyses become less and less reliable, right? And what you do instead is you turn to other evidence in the record to determine whether disparate impact occurred, and one of those other pieces of evidence that we would ask this court and that we did ask the district court to consider is the inexorable zero, but there are other— So there's no question you can consider that evidence, right? But it is not every time that you have a zero, it shows that there is discrimination or an unlawful employment practice, does it? Well, the— I mean, if there was one hiring decision, you would not say, oh, because you didn't hire a minority that time, there's inference of discrimination, right? If there were just one ever, I would agree with you. What is significant here is that there was one in 150 years, and there were zero from 2000 to 2016, and 2000 is significant just to give the court a little context. That's when the American League and the National League joined to make Major League Baseball as we currently know it. In 150 years, you're saying Major League Baseball was using the same practice for deciding who's promoted to crew chief? So I don't know how far back it goes. Okay, but you're challenging a specific practice, right? You'd have to show that they've been using this practice for 150 years in order to say that the whole 150-year history is relevant, wouldn't you? Has there been a position of crew chief for 150 years? I don't know about the entire time, but it has certainly been a long time. Okay, so you're just saying Major League Baseball has a bad history for 150 years, therefore I could challenge this practice that I really only allege was implemented in 2011. So that gets back to the historical significance— or excuse me, the significance of the historical presence of the inexorable zero. So in the City of New York case, which only focused on a select number of years— I think it was only three or four— the court in that case found significant probative value in the fact that no— the position at issue there was bridge painter— that no female bridge painter had ever been hired. And it wasn't because—it wasn't that it was never hired pursuant to the practice being challenged. It was that it was never hired, period. And in Victory, which is another case that discusses the inexorable zero, and that one does so in a disparate impact context, the court found specific significance in the fact that Hewlett-Packard, the defendant at issue there, had never hired a female to a managerial position. Again, not tied to— Okay, so you're saying we can look at this whole history. But just to be specific, if we in fact thought that we had to look at the period from when Joe Torrey was put in charge of this, from 2011 to 2017, we're talking about 10 hiring decisions, right? 2011 to 2017. I think that number's correct, yes. Right, and you're saying that there were no Hispanics promoted during that period, even though there was somebody after, so it would not be an inexorable zero if you filed this lawsuit later. But at the time that you filed the lawsuit, it was zero. There have been multiple after, but yes, yes. So there have been multiple after. So, okay. So I'm interested in your views about Dr. Martin's analysis. She concluded that from 2011 through 2018, the probability that no minorities would have been promoted to crew chief based on the available pool ranged between 59% and 79%, which is far beyond the 5% to 10% probability necessary to find a specifically significant disparity. Is that analysis unreliable in your view? I think that it is, and I think the case law makes it abundantly clear that it is. Why is that? So there's a whole body of case law that's discussed in the briefs, and I know that Waysome is one, City of New York, U.S. v. City of Yonkers, the Capacci case, the Port Authority case, all of these cases that say that when the sample sizes are small, traditional statistical analyses are unreliable. Well, she used a special kind of analysis, right, that takes account of the fact that the sample is too small, and I didn't see a particular challenge to that other than a general invocation of the inexorable zero concept, which is frankly cryptic to me. So is there something that is incorrect in her analysis because it was based on the fact that this was a small sample? I forget exactly what the special technique that she used was. It's called the Fisher's exact test. The Fisher's exact test. So does that take account of the fact that it's a small sample and we're looking at a small pool? It seems to me that your basic problem here is that there's a hiring issue that has occurred for a long time and that MLB has recognized, but here I haven't identified a particular practice that has caused a specifically significant disparity in the promotion rate to crew chief because you're talking about a relatively small group, but not a zero group. Right, and so I want to harken back to Dr. Martin's deposition test. We asked her how many, I think it was for the year 2011, how many minorities would have needed to apply to make this statistically significant, to yield a statistically significant result, and I believe that she answered, well, if it were six out of ten, that may do it or something to that effect, right? And for the majority of the years at issue and frankly probably for the majority of Major League Baseball's history, there's hardly six minority umpires in the ranks, let alone umpires that are— Well, yeah, we're focused still on 2011 through 2018. We're not talking about 150 years. No, and that's what I'm—so set aside pre-2011. The situation here— So you take issue with her number that the probability that no minorities would have been promoted ranged between 59% to 79%. Do you think that's wrong? On a mathematical level, I don't disagree with the numbers on the page. I disagree with the legal conclusions being drawn from the numbers on the page. Okay, thank you. Thank you. If Major League Baseball were somehow not hiring minorities into the position of umpire, the people discriminated against in that hiring decision would be able to sue, right? Could you say that again? I'm sorry. If Major League Baseball were not hiring enough minority umpires such that the pool that's eligible for promotion to crew chief were restricted, the people facing discrimination in those hiring decisions would be able to sue, right? The people facing the hiring decisions to get into the— Do you think that Major League Baseball is not hiring minority umpires out of prejudice? Is that—you're alleging that they're not hiring enough minority umpires, or you're just saying it just so happens there aren't enough in the pool. Therefore, we should look at statistics. I understand. And they should promote whichever ones they have in the pool. Okay, thank you for clarifying that. So this gets to a piece of evidence that's discussed in the record, a 2013 demographic overview where it was never quite made clear in discovery who created it, but somebody in MLB creates a pretty detailed, lengthy slideshow getting into the demographics of MLB umpires versus NFL refs and NBA refs and noting that, at least in the year 2013, there were 7% minority umpires in Major League Baseball compared to 40% in the NFL— But, of course, we're not talking about hiring. Mr. Hernandez was hired. Well, if they're serving as an umpire for an extended period of time, we'd have a narrow failure to promote case during a seven-year period, right? Right, but the failure to hire minorities is—has primitive value in this case because there's case law that says that when the small sample sizes and the inability to find statistical significance because of those small sample sizes is caused by something that the employer did, that's further evidence of disparate impact discrimination. And they—in that slideshow, they say— Even in regard to disparate impact discrimination, we're focusing on the process by which Mr. Torre himself applied standards that are difficult to measure in determining who to promote from among a small number of people, right? Correct, but because the sample sizes are— Okay, we have reserved time for rebuttal, so we'll hear from you again, but let's turn to the appellee, Mr. Abramson. Thank you, Your Honor. Thank you, Your Honors. May it please the Court. If I can begin with the claim of intentional discrimination because I believe, Judge Menasca, you are absolutely correct. The disparate impact claim is really no different than the disparate treatment claim. And we note on appeal that very little attention has been paid to the disparate treatment claim and this entire issue of whether there was a pretext for the decisions that were made. And there's a reason why there's no emphasis on the question of pretext by the appellant here. We need look no further than the appellant's own testimony and pleadings. He stated himself in his initial complaint, in his amended complaint, and in his deposition testimony that Joe Torrey, the undisputed decision-maker, chose not to promote him based on alleged personal, not racial, not national origin animosity that Torrey felt towards Hernandez based on an incident that took place in 2001 when Torrey, the field manager for the Yankees at the time, disagreed with a call that Hernandez made. I would submit, Your Honors, that it is extremely rare where we have an affirmative pleading in a discrimination case where the only evidence of animus is the plaintiff's argument that it is non-discriminatory animus. But even aside from the appellant's affirmative admission that Mr. Torrey's decisions have nothing to do with discriminatory animus, he reiterated that he has no information showing that the reasons he was not promoted were in any way tied to his race or national origin. He's not aware of any specific evidence regarding the decision made by Mr. Torrey concerning Mr. Hernandez on any protected characteristic. And that is why Judge Etkin found there was no triable issue that MLB's promotion decisions were based on umpire leadership and situation management skills and other legitimate reasons. Now, Mr. Hernandez admits that those are valid criteria. Those are not discriminatory criteria. He admits that those are valid criteria, and he admits that he has no evidence that the decisions were based on different factors, much less prohibited factors. Fourth, it's significant that Judge Etkin found there was no triable issue that even if Mr. Torrey was factually incorrect, even if he was wrong in his assessment of those criteria, that Mr. Torrey sincerely believed that Appellant Hernandez was deficient in leadership and situation management skills required for the cruci for the World Series. And Mr. Hernandez throughout this entire proceeding did not offer any evidence that would contradict that Mr. Torrey's beliefs about this were sincerely held. No evidence of pretext at all. Okay, so that is the disparate treatment claim. But what about disparate impact? So is it right that vesting hiring authority in a non-minority individual who gets to apply subjective criteria, that's an unlawful employment practice? No, Your Honor. In fact, I would suggest that I'm aware of no authority that would suggest that that is an appropriate alternative in a disparate impact claim. But, Your Honors, you don't even have to reach that issue because the problem with the disparate impact claim, disparate impact, as I think we all know and members of this panel have repeatedly written on, require that it be a facially neutral practice that has a statistically significant adverse impact. But what do you do when the pool is so small? You have something called the Fisher exact test, which is specifically designed to do statistical analysis when there is a small pool of numbers. This Court has repeatedly held that bottom line numbers are neither a sufficient basis to infer discrimination, pass summary judgment, or neither a sufficient basis to prevent, to infer that there is no discrimination. But why can't the evidence of inexorable zero be probative of whether a facially neutral policy has a discriminatory impact? In your brief, you seem to take the position that inexorable zero applies only in the disparate treatment context and not in disparate impact. Is that right? That's right, Your Honor. But, you know, we have a number of cases, including our own decision in town of East Haven, Victory and Hewlett-Packard, EDNY, Berkman and EDNY, Lumpkin in Northern District of Illinois, that have applied inexorable zero in the disparate impact context. Looking still, taking some, that is a basis for an evidentiary inference about the impact, a discriminatory impact. So can't that zero number be meaningful, a meaningful basis for an inference in both contexts? With respect to the cases that you referred, I think those each arise in a very different situation, either on a motion for a preliminary injunction in one case or with respect to other issues. It was never held in any of those cases, never any of those cases, that the so-called inexorable zero is a sufficient basis to get a disparate impact case to occur. Well, it may not be sufficient, but still is treated as relevant. Well, but in this case, Your Honor, we know it's not inexorable. To use the term inexorable zero means that the zero is inexplicable. We know it's not inexplicable because. . . I think it means unavoidable. Well, unavoidable or. . . And that would address Judge Pooler's question about when you have a really small sample and you can really have confidence even though the Fisher exact test purports to be exact, it's so small it's difficult to draw any meaningful conclusion from the statistics before you. I understand, Your Honor, but the Fisher exact test has been upheld by a number of courts as being appropriate when there's a small sample size. I would also note that there was no motion to exclude the expert testimony from Dr. Morton. So all of these arguments you're hearing for the first time on appeal about. . . And even. . . Well, maybe we have. . . We've said you could use that test or maybe you could also look at the inexorable zero, but I guess your position would also have to be that having a sample size of zero is not by itself sufficient to show, to make it a disparate impact claim, right? Well, that's correct. We also have to keep in mind that there are an extremely limited number of employment decisions that are at issue here, and this is why it goes back to a certain extent to the disparate treatment claim. There's 2013 where the record indicates that there were significant performance-related issues. There's 2014 where he. . . The evidence demonstrates that he was unable to get past those performance issues. Remember, he didn't apply in 2015. In 2016, there were no openings. And that leaves 2017 where the record is replete of issues that Mr. Torrey's had with respect to his management and leadership skills on the field. That Mr. Hernandez had. Mr. Hernandez had. I'm sorry. Thank you. But, counsel, the real problem is that there are so few minority umpires, 7%. How come? Well, the issue there is we do not. . . We take the umpires who are minor league umpires, and we do not do the hiring for the minor league. And that was shown in 2013 that that was actually a concern that MLB had, and it was an initiative, and the commissioner testified about this in his deposition, to improve the hiring going into the minor leagues to make more available for the major leagues. But I come back to the ultimate conclusion, and we've seen improvement, but I come back to the ultimate conclusion that this is not a hiring case. This is not about Mr. Hernandez. Right. If there was some reason why there was discrimination in the hiring of umpires into major league baseball in the first place, the people who were discriminated against in that context would need to sue. That is absolutely correct, Your Honor. Can I ask another question about the interaction between disparate treatment and disparate impact claims? So if, in fact, there's a factual finding that here there are legitimate nondiscriminatory reasons for the nonpromotion decision, does that mean that Mr. Hernandez, you know, whether or not there was a practice that was unlawful, that does not explain his decision? Or can he pursue both claims at the same time? He. . . I'm not sure I followed the question. I'm sorry. So if we think that there are legitimate nondiscriminatory reasons why they decided specifically that he should not be promoted, does that mean that the harm to him cannot be explained by some generally applicable practice of major league baseball? Well, I think we know the harm to him. I think that's right. We know the harm to him is explained by Mr. Torrey's repeated reference to his lack of leadership skills and his situational awareness in those circumstances that are identified in the record. This is not pled as a pattern or practice case. This is an individual employment decision. And so to the extent that we know why Mr. Hernandez was not promoted, that should be the end of the inquiry. Thank you, Your Honors. If there's nothing further. Okay. Thank you very much, Mr. Abramson. We'll turn back to Mr. Gregg on rebuttal. Thank you, Your Honors. I want to start with the disparate treatment claim just to address Mr. Abramson's arguments in the order that he raised them. This idea that the only allegation in the complaint about any animus towards Mr. Hernandez on the part of Joe Torrey is because of some personal disagreement back in 2001 is not accurate. There's allegations throughout the complaint laying out the various hiring decisions, the statistics, everything else, that Mr. Hernandez alleges in the pleading are proof of disparate treatment. So the district court, they made that type of argument in front of the district court. The district court summary judgment decision was not based at all on that allegation or characterization of plaintiff's pleadings. And I just wanted to reiterate that here because for some reason they keep making the argument when it's clear from the face of the pleadings that there's far more allegations about discriminatory disparate treatment than just the personal dispute back before the period even began. And I also wanted to address their reliance on Mr. Hernandez's deposition testimony that he didn't know of any evidence that would support his disparate treatment claim. The reason that, or at least one of the reasons that is, is because there was a protective order in this case that had an attorney's eyes only provision that prevented us, the lawyers, from showing Mr. Hernandez any evaluation or any document concerning any other umpire other than him. So he doesn't know what the evaluations say. He doesn't know the discrepancy between the daily field evaluation forms and the year-end reviews that are written by Peter Woodford and Joe Tori. So, of course, he doesn't know the evidence. That's one of the primary pieces of evidence that we rely on. So the fact that he's saying in his deposition he can't point to any specific thing should not be given any credence because it would be illogical for him to know that based on the restrictions that were put upon him in looking at discovery. I also want to talk about, just briefly, they keep pointing to the year-end evaluations that support Joe Tori's decisions. That say that Mr. Hernandez has a problem focusing or a problem with leadership. This is discussed at length in the briefs, and I don't have a ton of time, so I won't spend a bunch of time on it. But it's very apparent from the evidence in the record that the year-end evaluations are supposed to be based on the field evaluation forms that are filled out by umpires, supervisors, and observers who are present or observing the game virtually. And he got good year-end ratings most of the years, didn't he? Mr. Hernandez got good year-end ratings most of the years in question. He did have good year-end evaluations, but his daily, the field evaluation forms were replete with references praising his leadership skills, praising his focus, and these are people that are either at the stadium or watching the game on a computer on an individual game-by-game basis who repeatedly are saying, well, I'm really impressed with his focus, I'm impressed with his leadership, I'm impressed with his ability to bounce back. And yet every year, Joe Tori and Peter Woodfork, the two that write the year-end evaluations, are saying, well, you're struggling in these areas, Angel, you need to step it up. And then they're pointing to their own comments in the year-end evaluations as evidence that they're right. They cherry-picked the language in the year-end evaluations. I would argue that the year-end evaluations aren't based on the field evaluation forms that everyone said they were supposed to be based on. So relying on them as proof that their stated reasons are correct is really, it's very circuitous. Usually in the non-promotion decision cases, we say that the decision not to promote somebody just by itself can be inference of bias only if the candidate who wasn't promoted is just so overwhelmingly superior to the ones who were promoted that you can infer bias, right? Do you have that kind of claim here? The qualifications are a large part of our evidence on the disparate treatment claim, but there's more as well. There's the fact that these year-end evaluations were inaccurate, were manipulated, whatever word you want to use, because Mr. Hernandez's year-end evaluations were deflated. But you're saying because you think there's a mismatch between the year-end evaluations and the per-game evaluations. But you don't have separate evidence that the people who filled them out didn't believe what they were saying. I don't have separate evidence that they didn't believe it. I have separate evidence that they're wrong. Okay. Counsel, you alleged in your brief that there was a certain discriminatory aura, if not a directly discriminatory action in the hiring. And you cited to one of the MLBs, Marsh, I think was his name. Yes, ma'am. And when asked why the MLB was having a diversity problem, he talked about applicants from African-American schools and said they want to be, yeah, they want the job, but they want to be in the big leagues tomorrow. They don't want to go through all of that. And that makes sense in view of what we just heard, that the MLB hires from the minor leagues. So if they didn't want to be in the minor leagues, or unless that's not true. And it's less whether that statement is true or not and more the implication of the statement, if that makes sense. So there was a discriminatory view of black candidates. And I'm a little constrained by what I'm allowed to say in open court because of the protective order. There are things filed under seal, but there are references to comments made in African-American umpires evaluations that also have racial implications. They're under seal. Why are they under seal? Who sealed them? Judge Atkin did. He found that the third-party umpire's evaluations were owed a degree of privacy because their job performance relating to a non-party. And there's case law that says that. We haven't appealed that, but we filed under seal. And I'm not even sure they're in the briefs in this court, but they're under seal in the district court record. But since you called that comment out for Mr. Marsh, I wanted to alert you to similar type of comments in other umpires' evaluations. That's interesting. Thank you. Thank you very much, Mr. Gregg. The case is submitted. Thank you, Your Honor. And because that is the last case on the calendar this morning, we are adjourned. Court stands adjourned. Thank you.